IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
September 13, 2016 Session

## WILLIAM JAMES WATT v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Davidson County
No. 2011-A-121      Steve R. Dozier, Judge**

_____

**No. M2015-02411-CCA-R3-PC – Filed November 10, 2016**

_____

The petitioner, William James Watt, appeals the denial of his petition for post-conviction relief, which challenged his 2012 Davidson County Criminal Court jury convictions of three counts of rape of a child and three counts of aggravated sexual battery, claiming that he was deprived of the effective assistance of counsel at trial and on appeal. Discerning no reversible error, we affirm the denial of post-conviction relief.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and TIMOTHY L. EASTER, JJ., joined.

Dwight E. Scott, Nashville, Tennessee, for the appellant, William James Watt.

Herbert H. Slatery III, Attorney General and Reporter; Nicholas W. Spangler, Assistant Attorney General; Glenn R. Funk, District Attorney General; and Robert Jones, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

In January 2012, a Davidson County Criminal Court jury convicted the petitioner of three counts of rape of a child and three counts of aggravated sexual battery for the sexual assault of the victim, his wife's granddaughter.

At trial, the victim's mother testified that in 2010, she left her three children with her mother and the petitioner, whom the children called "Papa," once a week and that she and her family often ate dinner with her mother and the petitioner. *See State v. William James Watt*, No. M2012-01487-CCA-R3-CD, slip op. at 3 (Tenn. Crim. App., Nashville, Jan. 10, 2014). During the fall of that year, the four-year-old victim, the youngest of the three children, told her mother that the petitioner had "'tickled her

tootie.'" *Id.*, slip op. at 4. The victim elaborated that she and the petitioner were in the bed without their pants on when "she tickled him and that he tickled her." *Id.* The victim "said that the petitioner told her that she would never see him again if she told anyone." *Id.* The victim's mother questioned her son about the revelation, and he said he did not know anything about it. After speaking with her husband and her pastor, the victim's mother telephoned the police and reported the victim's allegations.

The victim submitted to a forensic interview and a medical examination. During a controlled telephone call between the victim's mother and the petitioner, the petitioner "initially denied that he had done anything wrong" but later "'confess[ed].'" *Id.*, slip op. at 5. In the recorded conversation, which was played for the jury, the petitioner told the victim's mother that "the victim told him that she liked to have her 'tootie'" tickled while the two lay on the bed together. *Id.* The petitioner said that the victim had then "reached down and touched herself and said that was her 'tootie'" before he admonished her "that 'boys and girls don't touch each other like that.'" *Id.* The conversation continued for some time before the petitioner said, "'You can go ahead and shoot me, I touched her once. And, yes, it was under the covers.'" *Id.* He told the victim's mother that he "just touched [the victim] with two fingers to tickle her 'at the very top' of [her] vagina.'" *Id.* The petitioner insisted that it was an isolated incident and said, "'If there is any way you can keep me out of jail, I would appreciate it. I would do just about anything.'" *Id.*

The then six-year-old victim testified that the petitioner had "tickled" her "tootie" on three separate occasions, "once in the attic of his home, once in his bathroom, and once in her 'Nana's room.'" *Id.*, slip op. at 6. The victim recalled that in the attic, the petitioner "touched her 'tootie' on her skin with his hands and a flower" and that he touched both the inside and the outside of her "tootie." On that same occasion, she touched the petitioner's "tootie," which she described as "long and stretchy." *Id.* She testified that she and the petitioner also touched each other under the covers "in her Nana's room." She testified that the two also "tickled" each other's private areas while in the bathroom. *Id.*

The petitioner's wife testified that she observed two instances of the petitioner's behaving inappropriately toward the victim. On both occasions, she walked in on the pair, and the petitioner had his shirt open and his hands on the victim's legs. *See id.*, slip op. at 7. She said that although it did "occur to her that this might be inappropriate, she could not 'ever fathom that he would do that.'" *Id.* When the petitioner's wife discussed the victim's allegations with him, he did not deny the victim's claims and "said he was hoping that they could keep it within the family." *Id.*, slip op. at 8.

When interviewed by the police, the 71-year-old petitioner said that "on three occasions [the victim] entered the bathroom" and, on two of those occasions, she saw him urinating. *Id.*, slip op. at 9. The petitioner said that he did not touch the victim on those occasions but that he did touch her one time while the two watched cartoons. He claimed that the victim had asked him to tickle her "tootie," and that he had obliged. He maintained, however, "that at no time did he 'do any insertion with [his] finger or anything else.'" *Id.* On another occasion in the petitioner's bedroom, the victim "pulled his shorts down," and her "lips touched his penis" twice. *Id.*, slip op. at 10. On that same occasion, the petitioner "also tickled and 'rub[bed]' her tootie for 'maybe a total of four minutes.'" *Id.* He identified the victim's "tootie" as "the top part of [her] vaginal area where he believed the clitoris was located." *Id.* The petitioner told the police that the four-year-old victim had "asked him to put his penis inside her, and he told her no." *Id.* He did acknowledge that on one occasion, the victim "'rolled over against it,' and his penis touched her leg. He did not recall whether it was the inside or the outside of her leg." *Id.*

The petitioner did not deny the veracity of the statements he made during the recorded conversation with the victim's mother or in his interview with the police. He did, however, deny having touched the victim inappropriately in the attic. *See id.*, slip op. at 12. He admitted tickling the victim "'above' where her clitoris would be located" while the two watched cartoons but denied that he rubbed the victim's vaginal area and insisted that he did not penetrate the victim. With regard to the incident in his bedroom, the petitioner testified that the victim "asked to play 'tent' and told him that he was going to have a surprise part." *Id.* He said that "his shorts slid down" as he propped up the sheet with his legs and that the victim placed her lips on "'the rim [of his penis]'" and "yelled, '[S]urprise.'" *Id.* "During cross-examination, the petitioner testified that he did not do anything wrong" and maintained "that at no time did he have any sexual desire to touch" the victim. *Id.*

On direct appeal, this court affirmed the petitioner's convictions and his total, effective 35-year sentence. *Id.*, slip op. at 1. The petitioner filed a timely petition for post-conviction relief, alleging that he had been deprived of the effective assistance of counsel at trial and on appeal. Via an amended petition, the petitioner claimed that trial counsel performed deficiently by failing to adequately prepare for trial, by failing to present certain witnesses, and by inadequately cross-examining the victim and that appellate counsel performed deficiently by failing to request oral argument and by omitting important argument points in the issues raised on appeal.

At the October 14, 2015 evidentiary hearing, trial counsel, an assistant public defender for 28 years, testified that he was appointed to represent the petitioner in 2011. He prepared for the petitioner's trial from the time he was appointed to the case

-3-

until the Christmas holiday in 2011, when the petitioner informed trial counsel of his intent to retain new counsel "right after New Year's." At that point, the petitioner's trial was scheduled for January 23, 2012. At a January 18, 2012 status hearing, the petitioner's newly-retained counsel moved the trial court for a continuance, citing his inability to be ready for the petitioner's trial. Trial counsel told the trial court that he, too, was not fully prepared for trial at that point because of the petitioner's desire for new counsel. After the trial court refused to grant a continuance in the case so that the petitioner's newly-retained counsel[1] could prepare for trial, trial counsel resumed his trial preparations. He testified that he would have liked to have had the roughly two weeks of trial preparation that he lost, but he did not feel unprepared for the petitioner's January 23, 2012 trial.

Trial counsel testified that he was "well aware of" potential witness Brenda Johnson, having received from her, via newly-retained counsel, a list of questions that should be asked of the petitioner's wife and the victim's mother. Trial counsel said that he spoke with her via telephone on January 19, 2011. He said that it was his understanding that Ms. Johnson had been told that the victim's mother and grandmother had been coaching her prior to trial but that Ms. Johnson's information in this regard "was not really specific and not really explicit enough" to warrant calling her as a witness. Counsel emphasized that he would not have hesitated to call Ms. Johnson as a witness had he been "convinced this was competent and persuasive evidence."

With regard to his questioning of the victim, who was six years old at the time of trial, trial counsel testified that, in his experience, "it's not always effective and persuasive to a jury for a defense attorney to attack" a child witness. For that reason, he made sure his cross-examination of the victim was thorough but not overbearing.

Appellate counsel testified that she prepared and filed a brief on the petitioner's behalf but did not request oral argument in the case. She explained that she viewed the appellate brief "as the primary form of advocacy" and that she did not often request oral argument. Appellate counsel said that she challenged the sufficiency of the convicting evidence vis-à-vis the State's election of offenses and that she used the many times that the victim gave equivocal answers as part of that challenge.

The victim's grandmother, who was also the petitioner's ex-wife, testified that Brenda Johnson was her "best friend for years" but that they were "no longer friends." She denied that she and the victim's mother had ever coached the victim in

---

[1] Post-conviction counsel initially attempted to enter the case as newly-retained counsel only 17 days before the petitioner's trial. The trial court refused to allow the last-minute change of counsel, and this court concluded on direct appeal that the trial court did not abuse its discretion in this regard. *See William James Watt*, slip op. at 19-20.

regard to her trial testimony. Indeed, she said that she had never discussed the allegations with the victim.

The victim's mother also denied coaching the young victim, saying, "It was important to me not to . . . coach her. I wanted her to say what happened to her."

Brenda Johnson testified that she met the petitioner when he married the victim's grandmother, who was her best friend. She claimed that the victim's grandmother told her that she and the victim's mother had "spent time coaching [the victim] and trying to help [the victim] know what to say and do." She alleged that the victim's grandmother discussed the allegations and the petitioner's trial while at lunch with the victim when Ms. Johnson was present. Ms. Johnson said that the victim "covered both ears and said, just please stop talking." She said that she did not attend the petitioner's trial but had chosen to come forward because she felt "like there was not a correct sentence." She acknowledged that there were "probably some things [the petitioner] did wrong," but she placed some of the blame on the victim, who "had been exposed for a long time to pornography."

The petitioner testified that trial counsel visited him one time while he was in jail and that the two met on four occasions after the petitioner was released on bond. The petitioner said that trial counsel provided him with the discovery materials in the case. He said that immediately following his first meeting with trial counsel in the spring of 2011, he decided that he wanted to retain different counsel, explaining, "I formed an opinion that if I possibly could raise the money that I would rather have a paid attorney instead of the public defender because he . . . already had a heavy case load." The petitioner said that it took him nine months to raise the funds to hire a new lawyer.

The petitioner testified that he asked trial counsel to "look into the home life of the child" because "she had been exposed to pornography on the computer while her father was watching" and because she had been subjected to physical abuse at the hands of her father. He claimed that trial counsel refused because "[h]e did not want to go outside the Davidson County lines to do any investigations."

The petitioner said that he asked trial counsel to call Bill Flume as a witness because Mr. Flume "knew these people as well." He said that Mr. Flume would have testified that the petitioner's ex-wife told Mr. Flume that the victim had complained "that her tootie was hurting" after the petitioner had been jailed for months.

During cross-examination, the petitioner admitted that he did not telephone the police after he saw the victim's father strike her, claiming that his ex-wife had threatened to divorce him if he did so. The petitioner also admitted that he used donated

funds to secure his release on bond rather than hire an attorney and that he used other funds to hire a lawyer to assist in his divorce rather than hire an attorney to handle his criminal case.

At the conclusion of the hearing, the post-conviction court took the petition under advisement. Via a written order denying relief, the post-conviction court accredited trial counsel's testimony that he had engaged in nine months of preparation before newly-retained counsel attempted to enter the case and that trial counsel was prepared for the petitioner's trial. The post-conviction court also accredited trial counsel's testimony that he had interviewed Ms. Johnson prior to the petitioner's trial "and determined that she would not be helpful to the defense." The court deemed trial counsel's decision not to call Ms. Johnson as a witness "a strategic decision based on years of criminal trial experience." The post-conviction court also noted that the testimony of the victim's mother and grandmother was more credible than that offered by Ms. Johnson. With regard to the petitioner's claim that trial counsel should have called Mr. Flume as a witness at trial, the post-conviction court observed that the petitioner failed to call Mr. Flume as a witness at the evidentiary hearing. The post-conviction court found that trial counsel thoroughly cross-examined the victim and accredited trial counsel's testimony "that he did not believe that attacking a young victim would be helpful to the defense." Ultimately, the post-conviction court concluded that trial counsel did not perform deficiently and that the petitioner was not prejudiced by trial counsel's handling of the case.

The post-conviction court also found that the petitioner had failed to establish that appellate counsel performed deficiently. The court accredited appellate counsel's testimony that oral argument was unnecessary in the petitioner's case and that she had gone over the trial transcript many times and had "set forth appropriate arguments in her brief." The court concluded that inclusion of the allegedly omitted instances of the victim's stating that she did not remember "would not have affected the outcome" of the appeal in light of "the proof presented at trial and considered on appeal, including recorded admissions by the petitioner and incriminating testimony from the victim and other State's witnesses."

In this timely appeal, the petitioner contends that the post-conviction court erred by denying relief, reiterating his claim that he was deprived of the effective assistance of trial and appellate counsel. The State asserts that the trial court properly denied relief.

As an initial matter, we observe that neither the original nor the amended petitions for post-conviction relief were verified by the petitioner as required by Code section 40-30-104(d). *See* T.C.A. § 40-30-104(d) ("The petitioner shall include all claims

known to the petitioner for granting post-conviction relief and shall verify under oath that all the claims are included."). Despite this procedural lapse, the post-conviction court allowed the case to proceed without pointing out the error. Additionally, the petitioner testified under oath at the evidentiary hearing, thereby adopting and attesting to the veracity of the claims in the petition. Under these circumstances, we will consider the merits of the petitioner's claims. *See Sexton v. State*, 151 S.W.3d 525, 530 (Tenn. Crim. App. 2004) (concluding that plenary review of petitioner's claims was appropriate despite absence of verification when "[t]he trial court did not notify the petitioner of its concerns until the evidentiary hearing" and "took sworn testimony from the petitioner and her trial attorneys relative to the petitioner's claims").

We view the petitioner's claim with a few well-settled principles in mind. Post-conviction relief is available only "when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103. A post-conviction petitioner bears the burden of proving his or her factual allegations by clear and convincing evidence. *Id.* § 40-30-110(f). On appeal, the appellate court accords to the post-conviction court's findings of fact the weight of a jury verdict, and these findings are conclusive on appeal unless the evidence preponderates against them. *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997); *Bates v. State*, 973 S.W.2d 615, 631 (Tenn. Crim. App. 1997). By contrast, the post-conviction court's conclusions of law receive no deference or presumption of correctness on appeal. *Fields v. State*, 40 S.W.3d 450, 453 (Tenn. 2001).

The petitioner claims that his trial counsel performed deficiently by failing to adequately prepare for trial, by failing to call Ms. Johnson as a witness, and by failing to sufficiently cross-examine the victim. He contends that, without these deficiencies, the outcome of his trial would have been different. The petitioner asserts that his appellate counsel performed deficiently by failing to request oral argument and by failing to include crucial portions of the victim's testimony in her challenge to the sufficiency of the convicting evidence and that her deficiencies prejudiced the outcome of his appeal.

Before a petitioner will be granted post-conviction relief based upon a claim of ineffective assistance of counsel, the record must affirmatively establish, via facts clearly and convincingly established by the petitioner, that "the advice given, or the services rendered by the attorney, are [not] within the range of competence demanded of attorneys in criminal cases," *see Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975), and that counsel's deficient performance "actually had an adverse effect on the defense," *Strickland v. Washington*, 466 U.S. 668, 693 (1984). In other words, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a

probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Should the petitioner fail to establish either deficient performance or prejudice, he is not entitled to relief. *Id.* at 697; *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). Indeed, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Strickland*, 466 U.S. at 697.

When considering a claim of ineffective assistance of counsel, a reviewing court "begins with the strong presumption that counsel provided adequate assistance and used reasonable professional judgment to make all significant decisions," *Kendrick v. State*, 454 S.W.3d 450, 458 (Tenn. 2015) (citing *Strickland*, 466 U.S. at 689), and "[t]he petitioner bears the burden of overcoming this presumption," *id.* (citations omitted). We will not grant the petitioner the benefit of hindsight, second-guess a reasonably based trial strategy, or provide relief on the basis of a sound, but unsuccessful, tactical decision made during the course of the proceedings. *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). Such deference to the tactical decisions of counsel, however, applies only if the choices are made after adequate preparation for the case. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

A claim of ineffective assistance of counsel is a mixed question of law and fact. *Kendrick*, 454 S.W.3d at 457; *Lane v. State*, 316 S.W.3d 555, 562 (Tenn. 2010); *State v. Honeycutt*, 54 S.W.3d 762, 766-67 (Tenn. 2001); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). When reviewing the application of law to the post-conviction court's factual findings, our review is de novo, and the post-conviction court's conclusions of law are given no presumption of correctness. *Kendrick*, 454 S.W.3d at 457; *Fields*, 40 S.W.3d at 457-58; *see also State v. England*, 19 S.W.3d 762, 766 (Tenn. 2000).

In our view, the petitioner failed to establish by clear and convincing evidence facts supporting a conclusion that either trial or appellate counsel performed deficiently.

Trial counsel's accredited testimony established that, although he lost two weeks' preparation time after the petitioner tried to change attorneys, he was fully prepared for the petitioner's trial. His accredited testimony also established that trial counsel interviewed Ms. Johnson but deemed her potential testimony neither credible nor persuasive. Furthermore, the post-conviction court found that Ms. Johnson's testimony lacked credibility. With regard to his cross-examination of the victim, we agree with the post-conviction court that trial counsel's decision not to attack the six-year-old victim was a reasonable trial strategy.

The petitioner presented no evidence to suggest that appellate counsel's failure to request oral argument affected the outcome of his appeal. Appellate counsel's

accredited testimony established that it was her belief that the appellate brief was the primary vehicle of appellate advocacy. Moreover, the petitioner failed to show how appellate counsel's inclusion in her brief of certain portions of the victim's testimony would have altered the outcome on appeal. As is indicated by our opinion on direct appeal, this court reviewed the trial record in its entirety when considering his challenge to the sufficiency of the convicting evidence.

Accordingly, we affirm the judgment of the post-conviction court.

_____
JAMES CURWOOD WITT, JR., JUDGE